[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12960

_____

JAVIER GARCIA-BENGOCHEA,

Plaintiff-Appellant,

*versus*

CARNIVAL CORPORATION,
a foreign corporation
d.b.a. Carnival Cruise Lines,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-21725-JLK

_____

2     Opinion of the Court    20-12960

————————————

No. 20-14251

————————————

JAVIER GARCIA-BENGOCHEA,

Plaintiff-Appellant,

*versus*

ROYAL CARIBBEAN CRUISES, LTD.,

Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-23592-JLK

————————————

Before JORDAN and NEWSOM, Circuit Judges, and BURKE,[*] District
Judge.

———————

[*] The Honorable Liles Burke, U.S. District Judge for the Northern District of
Alabama, sitting by designation.

PER CURIAM:

We grant the petition for panel rehearing, vacate our prior opinion and Judge Jordan's concurrence, reported at __ F. 4th __, 2022 WL 17170885 (11th Cir. Nov. 23, 2022), and substitute the following in their place. The only changes to the prior opinion and the concurrence consist of statutory citations and references to the Helms-Burton Act.

When Fidel Castro overthrew Fulgencio Batista in 1959, most Cubans who fled to the United States hoped that they would one day return to their homeland. But many would never again see the beaches of Varadero or stroll along the Malecón. They built homes and lives in the United States, never forgetting what they left behind on an island just 90 miles off the coast of Key West.

In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §§ 6021 *et seq.* (known as the "Helms-Burton Act"), in an attempt to provide a means of compensation for some of the losses suffered as a result of the Castro regime's actions. As relevant here, Title III of the Act provides a private cause of action for U.S. nationals against those who knowingly traffic in property expropriated by the Cuban government after the start of the Cuban Revolution. *See* § 6082(a)(1)(A).

Title III remained dormant for 23 years, and through three different administrations, because the right to bring an action under Title III was suspended by Presidential decree. *See* § 6085(c)(1)(B) (granting the President the authority to suspend the

right to bring an action under Title III if, among other things, the President determines the suspension is "necessary to the national interests of the United States and will expedite a transition to democracy in Cuba"). But in May of 2019, President Trump lifted the suspension, making Title III fully effective. President Biden, since taking office, has not suspended Title III and it therefore remains in effect today.

This appeal concerns a number of issues pertaining to claims brought under Title III. First, does the plaintiff, Dr. Javier Garcia-Bengochea, have Article III standing to assert his claims against Carnival and Royal Caribbean? Second, has Dr. Garcia-Bengochea stated plausible Title III claims? We heard oral argument on these matters, invited the Department of Justice to file an *amicus curiae* brief addressing certain questions about the Act, and permitted the parties to respond to that brief.

We conclude that Dr. Garcia-Bengochea has standing to assert his Title III claims, but that those claims fail on the merits. We therefore affirm the district court's grant of judgment on the pleadings in favor of Carnival and Royal Caribbean.

## I

We begin with an overview of Title III of the Helms-Burton Act and then pivot to the allegations in Dr. Garcia-Bengochea's complaints. Given that this case was resolved at the pleading stage, we accept those allegations as true and draw reasonable inferences

in Dr. Garcia-Bengochea's favor. *See Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022).

## A

In response to the takings of American property in Cuba by the Castro regime, Congress amended the International Claims Settlement Act of 1949 with the Cuban Claims Act of 1964, 22 U.S.C. §§ 1643-1643k. The Cuban Claims Act authorized the Foreign Claims Settlement Commission to gather information for an eventual negotiation on claims of confiscated properties in Cuba. The Commission reviewed the applications of U.S. corporate and individual claimants and certified as legitimate nearly 6,000 claims valued at about $1.9 billion. *See* Sylvia M. Becker & Patrick Hovakimian, *Foreign Claims Settlement Commission of the U.S.*, United States Department of Justice (updated April 21, 2022) (available at https://www.justice.gov/fcsc/claims-against-cuba). In 2005 and 2006 the Commission, pursuant to a subsequent grant of statutory authority, conducted a second round of claims review. *See* Pub. L. 105-277, § 2211, 112 Stat. 2681-812. Cuba and the United States, however, have never reached a settlement on these claims (or, for that matter, on claims by Cuba against the United States). *See generally* Richard E. Feinberg, *Reconciling U.S. Property Claims in Cuba: Transforming Trauma into Opportunity*, Latin America Initiative at Brookings, at 2-15 (December 2015).

In 1996, Congress passed the Helms-Burton Act in part "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime."

22 U.S.C. § 6022(6). Title III of the Act aims to deter "trafficking in confiscated property" with the purpose of "protect[ing] the claims of United States nationals who had property wrongfully confiscated by" the Cuban government. *See* § 6081(6)(B).

Specifically, Title III provides "United States nationals who were the victims of th[o]se confiscations . . . with a judicial remedy in the courts of the United States." § 6081(11). To that end, it establishes a private right of action for "any United States national who owns the claim to [confiscated property]" against "any person that . . . traffics in [such] property." § 6082(a)(1)(A). A United States national is "any United States citizen" or "any other legal entity. . . organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States." § 6023(15)(A)–(B).[1]

A person "traffics" in confiscated property if that person knowingly and intentionally:

---

[1] *See also* 22 U.S.C. § 1643(l) ("Notwithstanding any other provision of this chapter and only for purposes of section 6082 of this title, a United State[s] district court, for fact-finding purposes, may refer to the [Foreign Claims Settlement] Commission, and the Commission may determine, questions of the amount and the ownership of a claim by a United States national (as defined in section 6023 of this title), resulting from the confiscation of property by the Government of Cuba described in section 1643b(a) of this title, *whether or not the United States national qualified as a national of the United States (as defined in section 1643a(1) of this title) at the time of the action by the Government of Cuba*.") (emphasis added).

(i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

§ 6023(13).

## B

Dr. Garcia-Bengochea is a U.S. citizen and a U.S. national as that term is defined in 22 U.S.C. § 6023(15).  He claims to be the "rightful owner of an 82.5% interest in certain commercial waterfront real property in the Port of Santiago de Cuba," identified by the Cuban government as La Marítima and Terminal Naviera. *See* CC D.E. 1 at ¶ 6; RC D.E. 1 at ¶ 7.[2]

---

[2] We refer to the docket in the Carnival case, No. 20-12960, as "CC D.E." and to the docket in the Royal Caribbean case, No. 20-14251, as "RC D.E."

The Cuban government nationalized, expropriated, and seized ownership of La Marítima on October 13, 1960, via Cuba's Gazette Law 890, and maintains possession of the property today. It has not paid any compensation to Dr. Garcia-Bengochea or anyone else for its seizure or use and the claim to the property has not been resolved pursuant to an international claims settlement or other settlement procedure. Dr. Garcia-Bengochea has never abandoned his legitimate interest in the property. *See* CC D.E. 1 at ¶¶ 7–9; RC D.E. 1 at ¶ 8–10.

The Foreign Claims Settlement Commission—pursuant to the International Claims Settlement Act—certified a portion of Dr. Garcia-Bengochea's ownership interest in La Marítima when it adjudicated the claim of his cousin, Albert Parreño. This portion represents Dr. Garcia-Bengochea's 32.5% interest in the property, and was valued by the Commission in 1970 at $289,549.92. *See* CC D.E. 1-1 at 6. The remaining portion of Dr. Garcia-Bengochea's interest in the property is based upon an uncertified claim. *See* CC D.E. 1 at ¶¶ 10–11 & Ex. A; RC D.E. 1 at ¶¶ 11–12.[3]

Starting in May of 2016, Carnival knowingly and intentionally conducted its commercial cruise line business to Cuba using La Marítima by regularly embarking and disembarking its passengers there. In the summer of 2018, Royal Caribbean began doing the

---

[3] On appeal, Dr. Garcia-Bengochea has abandoned the uncertified portion of his claim. *See* Appellant's Br. in No. 20-12960 at 5; Appellant's Br. in No. 20-14251 at 6.

same. Both cruise lines have used the property without the authorization of Dr. Garcia-Bengochea or any other U.S. national who holds a claim to it. And both cruise lines have profited from the Cuban government's possession of La Marítima, again without the authorization of or payment to Dr. Garcia-Bengochea (or any other U.S. national who holds a claim to the property). *See* CC D.E. 1 at ¶¶ 12–13; RC D.E. 1 at ¶¶ 13–14.

According to the complaints, the knowing and intentional conduct of Carnival and Royal Caribbean constitutes trafficking under § 6023(13)(A). As a result, Dr. Garcia-Bengochea—who provided the cruise lines with written notice by certified mail of his intent to commence an action under Title III—claims that he is entitled to damages under § 6082. Those claimed damages are (a) the amount greater of (i) the amount certified by the Foreign Claims Settlement Commission, plus interest, or (ii) the amount determined by a special master pursuant to § 6083(a)(2), or (iii) the fair market value of the property, plus interest; and (b) treble damages of the amount determined above. *See* CC D.E. 1 at ¶¶ 15–16, 20; RC D.E. 1 at ¶¶ 16–17, 21.

## II

Carnival and Royal Caribbean argue for the first time on appeal that Dr. Garcia-Bengochea does not have Article III standing to assert his Title III claim. Despite the late assertion, we are required to address standing because it affects subject-matter jurisdiction, *see Florida Ass'n of Med. Equip. Dealers v. Apfel*, 194 F.3d 1227, 1230 (11th Cir.1999), and we do so below. Our analysis is

plenary.  *See Muransky v. Godiva Chocolatier, Inc.,* 979 F.3d 917, 923 (11th Cir. 2020) (en banc).

To have Article III standing, a plaintiff must have suffered an injury in fact that can be fairly traced to the defendant's conduct and that can be redressed with a favorable decision.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  As this case is at the pleading stage, Dr. Bengochea has to allege sufficient facts to plausibly state these three elements.  *See Thole v. U.S. Bank N.A.*, 140 S.Ct. 1615, 1621 (2020); *Glynn Env't Coal., Inc.*, 26 F.4th at 1240.

We must not, however, "confus[e] weakness on the merits with absence of Article III standing." *Ariz. State Legislature v. Ariz. Ind. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (citation omitted).  Indeed, we "must . . . assume that on the merits [Dr. Garcia-Bengochea] would be successful in [his Title III] claim[s.]" *Culverhouse v. Paulson & Co. Inc.,* 813 F.3d 991, 994 (11th Cir. 2016) (citation omitted).  *See also Warth v. Seldin*, 422 U.S. 490, 502 (1975) (assuming the validity of the plaintiff's claims in determining the question of standing).

As far as we can tell, all the courts that have addressed the issue—two circuit courts and a number of district courts—have concluded that a plaintiff like Dr. Garcia-Bengochea has, at the motion to dismiss stage, standing to bring a claim under Title III.  *See, e.g., Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 334–36 (5th Cir. 2021); *Glen v. Trip Advisor LLC*, 529 F.Supp.3d 316, 326–28 (D. Del. 2021), *aff'd,* 2022 WL 3538221, at *2 (3d Cir. August 18, 2022); *de Fernandez v. Crowley Holdings, Inc.*, No. 21-CV-20443, 2022 WL

860373, at *3–*4 (S.D. Fla. Mar. 23, 2022); *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, 534 F.Supp.3d 1, 30–32 (D.D.C. 2021); *Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. v. Société Générale, S.A.*, 577 F.Supp.3d 295, 307–10 (S.D.N.Y. Dec. 22, 2021); *Moreira v. Société Générale, S.A.*, 573 F.Supp.3d 921, 925–29 (S.D.N.Y. Nov. 24, 2021); *N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, No. 20-CV-22471 (DPG), 2021 WL 3741647, at *3–*6 (S.D. Fla. Aug. 24, 2021); *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 484 F.Supp.3d 1215, 1226–31 (S.D. Fla. 2020); *Havana Docks Corp. v. MSC Cruises SA Co.*, 484 F. Supp. 3d 1177, 1190–95 (S.D. Fla. 2020); *Havana Docks Corp. v. Carnival Corp.*, No. 19-CV-21724 (BB), 2020 WL 5517590, at *6–*11 (S.D. Fla. Sept. 14, 2020). As explained below, we agree with their decisions on this point.

## A

To establish an injury in fact a plaintiff must have suffered "an invasion of a legally protected interest" that is both "concrete and particularized." *Lujan*, 504 U.S. at 560 (citations omitted). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). *See also Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) ("Art. III requires the [plaintiff] … to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.")

(internal quotation marks and citation omitted). An injury is concrete if it is "real" and "not abstract." *Spokeo,* 578 U.S. at 340.

The alleged injury here is particularized, and the cruise lines do not argue to the contrary. Dr. Garcia-Bengochea is suing based on his alleged personal interest in (or at least claim to) property that the Cuban government confiscated decades ago, and which has since been used without permission and without compensation. *See Trip Advisor,* 529 F.Supp.3d at 327; *Norwegian Cruise Line*, 484 F.Supp.3d at 1229. He is not asking a court to "decid[e] questions of broad social import" that are shared by other citizens in equal measure. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100 (1979). He is instead claiming injury to himself "as a result of the violation of . . . [statutorily] created legal rights." *Palm Beach Golf Center-Boca, Inc. v. John D. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251 (11th Cir. 2015). And to the extent that there may be a dispute about whether Dr. Garcia-Bengochea has an enforceable interest in La Marítima, that dispute does not affect his standing. We must assume the validity of a claim in assessing standing, *see Culverhouse*, 813 F.3d at 994, and "'when the existence of a protected property interest is an element of the claim, deciding whether the interest exists virtually always goes to the merits rather than the standing.'" *Am. Airlines*, 7 F.4th at 335 (quoting *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 736 (7th Cir. 2020)). *Accord PDVSA U.S. Litig. Tr. v. Lukoil Pan Americas, LLC*, 991 F.3d 1187, 1191–92 (11th Cir. 2021).

Carnival and Royal Caribbean argue that Dr. Garcia-Ben-gochea's injury is not concrete because he was not affected in any way by their use of La Marítima.  As Carnival puts it, Dr. Garcia-Bengochea would be "in precisely the same position he stands in now" had it never sailed to Cuba or used La Marítima.  *See* Br. for Carnival in No. 20-12960 at 16.  The cruise lines also contend that there is no historical analogue for the Title III cause of action that Dr. Garcia-Bengochea is asserting, and that Congress' judgment does not identify any real injury.  *See id.* at 17–29; Br. for Royal Caribbean in No. 20-14251 at 18–25.  We disagree on both points.

The Supreme Court has said that "[i]f a defendant has caused physical or *monetary* injury to the plaintiff, the plaintiff has suf-fered a concrete injury in fact under Article III."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (emphasis added).  We have similarly stated that "financial loss" is an "obvious" tangible harm that constitutes injury in fact.  *See Muransky,* 979 F.3d at 926.  Assuming the validity of his Title III claims, *see Culverhouse*, 813 F.3d at 994, Dr. Garcia-Bengochea has alleged a tangible, and there-fore concrete, injury.  According to the complaints, the Foreign Claims Settlement Commission certified a portion of Dr. Garcia-Bengochea's interest in La Marítima and valued that portion at $289,549.92 in 1970.  That certified claim provides, in part, a means of quantifying financial harm.  *See Exxon Mobil*, 534 F.Supp.3d at 31.

Though "the injury may have its origin in the confiscation" of La Marítima by the Cuban government, the cruise lines' alleged

"continued use" of the property without Dr. Garcia-Bengochea's authorization does not render his "harm less tangible today." *Norwegian Cruise Line,* 484 F.Supp.3d at 1228. *See also Moreira*, 573 F.Supp.3d at 926 ("Plaintiffs allege an injury from Defendants' trafficking that is distinct from the confiscation of Banco Pujol by the Cuban Government."). In other words, the cruise lines' failure to obtain permission and pay for use of the property constitutes a pocketbook injury. *See* § 6023(13)(A) (defining trafficking, in part, as "knowingly and intentionally . . . engag[ing] in a commercial activity using or otherwise benefiting from confiscated property . . . *without the authorization* of any United States national who holds claim to the property") (emphasis added).

As someone with a claimed interest in La Marítima, Dr. Garcia-Bengochea "is shut out wrongfully from the gains produced by exploiting property that is rightfully h[is]." *Sucesores*, 577 F.Supp.3d at 309. When Carnival and Royal Caribbean used the property as a part of their commercial businesses—without the permission of or payment to Dr. Garcia-Bengochea—they engaged in exactly the kind of conduct contemplated and prohibited by the Act. Congress knew that the Cuban government had wrongfully confiscated property from U.S. nationals, and enacted Title III for the very purpose of denying traffickers any profits they might obtain by subsequently exploiting the wrongful seizures. *See* § 6022(6). The contention that the initial confiscation somehow immunizes the later trafficking goes against the Act's text and purpose.

Consider an analogy to takings law. When real property is taken by the government through eminent domain, the financial harm to the owner does not necessarily end with the physical act of confiscation. If the property produced rental income, for example, the just compensation analysis can include the amounts that would have been received by the owner during the useful life of the property. *See, e.g., Monongahela Nav. Co. v. United States*, 148 U.S. 312, 343 (1893) ("[W]hen by the taking of the tangible property the owner is actually deprived of the franchise to collect tolls, just compensation requires payment, not merely of the value of tangible property itself, but also that of the franchise of which he is deprived."); *United States v. Tampa Bay Apts., Inc.*, 294 F.2d 598, 601, 607 (5th Cir. 1961) (considering, in a case involving compensation for the government's use of eminent domain, the rental income produced by two housing projects). The analogy is not perfect, for in the takings scenario a court takes into account the stream of future income in determining overall just compensation, so that there is no unlawful government exploitation of the property after it has been taken through eminent domain. Nevertheless, the analogy suggests that the continued use of confiscated property—without permission and without payment—constitutes an ongoing and tangible financial harm.

Even if we assume that Dr. Garcia-Bengochea's claimed injury is somehow intangible, it is still concrete. The existence of a statutory right does not, by itself, establish concreteness, *see Thole*, 140 S.Ct. at 1620, but here the Title III remedy Congress created

bears a close relationship to the remedy of unjust enrichment. *See generally* Restatement (First) of Restitution § 1 (ALI 1937) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other."). In enacting Title III, Congress recognized that the international judicial system "lack[ed] fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property," § 6081(8), and sought to provide a means of redress for the continued exploitation and use of such property. *See Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) ("It is the purpose of the [Act] to deter third party foreign investors from trafficking in the confiscated property. . . . This purpose is achieved through the establishment of a new statutory remedy[.]").

We agree with the Fifth Circuit (and other courts) that "[t]he harm allegedly caused by [the cruise lines'] trafficking bears a close relationship to unjust enrichment, which has indisputable common-law roots." *Am. Airlines*, 7 F.4th at 334 (citing *Development in the Law: Chapter One—The Intellectual History of Unjust Enrichment*, 133 Harv. L. Rev. 2077, 2078–87 (2020)). *See also Glen*, 2022 WL 3538221, at *2 ("[W]e agree with the Fifth Circuit that the harm Glen alleges—namely, [the defendants'] wrongfully profiting from his usurped properties—bears a 'close relationship to unjust enrichment, which has indisputable common-law roots.'"); *Moreira*, 573 F.Supp.3d at 927 ("Congress did indeed 'elevate to the status of legally cognizable' a harm that has traditionally been

regarded as providing a basis for a lawsuit in American courts: the harm of unjust enrichment."). As noted earlier, a Title III plaintiff like Dr. Garcia-Bengochea is "injured concretely when [he] is shut out wrongfully from the gains produced by exploiting property" that he claims is "rightfully h[is]." *Sucesores*, 577 F.Supp.3d at 309.

Think of a situation where the government nationalizes or confiscates a six-bedroom beachfront home without paying its owner anything for it and transfers the property to a political supporter for free. The supporter then turns the property into a successful boutique hotel, which he operates for decades at a significant profit. The political supporter, who has not obtained the original owner's permission (or paid anything) for the use of the property, can be said to have been unjustly enriched (at least to some degree) at the owner's expense. *See* Restatement (First) of Restitution, at § 1, comment a ("A person is unjustly enriched if the retention of the benefit would be unjust."). This hypothetical is not too far removed from what Dr. Garcia-Bengochea is suing over here.

## B

To satisfy the traceability requirement, a plaintiff must establish a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Dr. Garcia-Bengochea therefore needs to sufficiently allege that his injury is "fairly traceable" to the cruise lines' conduct rather than "the result of the independent action of some third party not before the court." *Id.* (internal quotation and citation omitted).

Carnival and Royal Caribbean contend, in an argument related to their position on injury, that Dr. Garcia-Bengochea has not alleged causation because his injury is the result of the Cuban government's confiscation of La Marítima, and not their own conduct. Like other courts which have addressed the same or similar argument in Title III cases, we are not persuaded.

It seems to us that the argument proceeds from the wrong starting point. The injury that must be traced here is the cruise lines' alleged use of La Marítima without obtaining Dr. Garcia-Bengochea's permission and without payment of compensation for that use. As we have explained, Dr. Bengochea has been allegedly injured by *both* the Cuban government's initial confiscation of the property and the cruise lines' subsequent trafficking in the property. Because his action targets the latter and not the former, the causation element is satisfied. *See Am. Airlines*, 7 F.4th at 336 ("[The plaintiff's] alleged injury is traceable to American. He alleges an injury that is entirely separate from either the confiscation of the properties or the operations of hotels on the properties."); *Exxon Mobil*, 534 F.Supp.3d at 31 ("Defendants . . . miss the mark by characterizing Exxon's injury as the expropriation of Essosa's property."); *Norwegian Cruise Line*, 484 F.Supp.3d at 1230 ("NCL's conduct of using and profiting from the Subject Property is fairly traceable to Plaintiff's claimed injuries.").

It is true, in a chronological sense, that the cruise lines' ability to cause the trafficking injury identified in Title III is linked to the earlier actions of the Cuban government. Had the Cuban

government not confiscated La Marítima, Carnival and Royal Caribbean would not have been able to use that property without compensating its owners. But that is not a problem at this point in the litigation. The Supreme Court has been clear that "[p]roximate cause is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). And so have we. *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("A showing that an injury is fairly traceable requires less than a showing of proximate cause.") (internal quotations omitted).

*Resnick* is a good example of how the traceability element works. In that case, members of health care plans brought several tort and contract claims against a health care plan operator for its failure to secure laptops at its office that contained the members' sensitive information. The laptops were stolen by third parties and then sold to another individual with a history of dealing in stolen property. Subsequently, several members became victims of identity theft. Those members were injured by the person who allegedly either sold or used the information stored in the laptops to commit identity theft. *See Resnick,* 693 F.3d at 1321–22. The health care operator, the defendant which was being sued, was not the sole or even proximate cause of the members' injuries. Had the laptops not been stolen, it is possible that the unsecured information would not have been compromised in the data breach. And if the laptops had not been sold by the thieves to the person who sold or used the confidential information, there may not have been

any identity theft. Nevertheless, causation for the purposes of Article III was not a problem with respect to the health care operator. We explained that traceability does not equate to proximate cause, noting that "[e]ven a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the traceability requirement." *Id.* at 1324.

As *Resnick* demonstrates, the presence of multiple actors in a chain of events that lead to the plaintiff's injury does not mean that traceability is lacking with respect to the conduct of a particular defendant. If the facts alleged are taken as true, and if the validity of Dr. Garcia-Bengochea's claim is assumed, the claimed trafficking injury is fairly traceable to Carnival and Royal Caribbean, even if they had some help from the Cuban government along the way.

## C

Finally, we address redressability, the third and final requirement of Article III standing. To satisfy this requirement, a plaintiff needs to show that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan,* 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rts. Org.,* 426 U.S. 26, 38, 43 (1976)). At this stage, Dr. Garcia-Bengochea must plausibly allege that a decision in his favor would "significant[ly] increase ... the likelihood that [he] would obtain relief that directly redresses the injury suffered." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) (citation omitted). Significantly, for standing purposes the relief sought need not be

complete. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (addressing whether an award of nominal damages satisfies redressability: "True, a single dollar often cannot provide full redress, but the ability 'to effectuate a partial remedy' satisfies the redressability requirement."); *Made in the U.S.A. Foundation v. United States*, 242 F.3d 1300, 1310 (11th Cir. 2001) (agreeing that a "partial remedy would be sufficient for redressability") (internal quotation marks and citation omitted).

Dr. Garcia-Bengochea has sufficiently alleged redressability. His claimed financial injury includes the cruise lines' alleged use of (i.e., trafficking in) La Marítima without his permission and without compensation. An award of damages under Title III will, at least in part, redress that injury. *See, e.g., Trip Advisor*, 529 F.Supp.3d at 328 ("Glen's alleged injury can be redressed by a favorable judgment. A favorable judgment would entitle Glen to money damages as specified in the Helms-Burton Act . . ., compensation that would redress the harm [he] allegedly suffered from Defendants' economic exploitation of the Subject Properties."); *Norwegian Cruise Line,* 484 F.Supp.3d at 1231 (explaining that a Title III plaintiff need not regain its confiscated property to demonstrate redressability).

We note, as well, that Dr. Garcia-Bengochea alleges that he his interest in La Marítima has been partially certified by the Foreign Claims Settlement Commission. One measure of damages specified in Title III is the amount of such a certified claim, *see* §

6082(a)(1)(A)(i)(I), and that too provides redressability for purposes of standing. *See Exxon Mobil*, 534 F.Supp.3d at 31. [4]

## III

The district court granted judgment on the pleadings in favor of Carnival under Rule 12(c). Applying 22 U.S.C. § 6082(a)(4)(B), it concluded that Dr. Garcia-Bengochea—a U.S. national—could not bring a claim under Title III because he "acquired" his interest in La Marítima through inheritance after the enactment of the Helms-Burton Act. *See* CC D.E. 120 at 6–8. The district court also granted judgment on the pleadings in favor of Royal Caribbean on the same grounds. *See* RC D.E. 32 at 5–7. Dr. Garcia-Bengochea appeals those rulings.

## A

We review the grant of judgment on the pleadings de novo. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

---

[4] As a general matter, "[r]emedies should not put a plaintiff in a more favorable position than he or she would have enjoyed absent [the wrongful conduct.]" *Babb v. Wilkie*, 140 S. Ct. 1168, 1178 (2020). Insofar as Carnival and Royal Caribbean contend that the remedies in Title III may financially overcompensate for the harm suffered by plaintiffs like Dr. Garcia-Bengochea, that contention is premature. It goes to the merits and does not affect the existence of Article III standing at this stage of the case. In any event, it is not at all clear that the damages recoverable by someone like Dr. Garcia-Bengochea would historically be limited to the sums due for the use of the property. "Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity, even though that remedy may have gone by different names." *Liu v. S.E.C.,* 140 S. Ct. 1936, 1942 (2020).

Under Rule 12(c), the district had to accept as true the factual allegations in the pleadings of the non-moving party—here Dr. Garcia-Bengochea—and draw all reasonable inferences in his favor. *See Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999); 2 Moore's Federal Practice § 12.38 (3d ed. 2019). And it also had to "treat as false the allegations in [the] answer[s] that contradict[ed]" the allegations made by Dr. Garcia-Bengochea. *See McDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006). *See also* 1 Richard A. Givens, Manual of Federal Practice, § 4.31 (4th ed. 1991) ("For purposes of a Rule 12(c) motion, all controverted allegations in the pleadings of the moving party are treated as false[.]").

## B

In his complaint, Dr. Garcia-Bengochea alleged that he is the rightful owner of an interest in La Marítima, and that a portion of his interest was certified by the Foreign Claims Settlement Commission in 1970 in resolving the claim of Albert Parreño (whom we'll refer to as Albert). *See e.g.,* CC D.E. 1-1 at ¶¶ 6, 10 & Ex. A. He did not allege anything further as to how, or when, or from whom, he obtained his interest in La Marítima.

The information about Dr. Garcia-Bengochea's ownership of the interest in La Marítima came from Carnival's answer, the exhibits attached to that answer, the Rule 12(c) motion, and assertions made by Dr. Garcia-Bengochea himself. *See e.g.,* RC D.E. 52 at 8 & Ex. 1 & 2; CC D.E. 60-24; CC D.E. 61 at 2-3. Those documents told the following story: (a) Albert, a U.S. national, owned an interest in La Marítima; (b) Albert died in 1972, after the Foreign

Claims Settlement Commission certified a portion of his interest in La Marítima; (c) through his will, Albert passed on his interest in La Marítima to his brother, Desiderio Parreño (whom we'll call Desiderio); (d) Desiderio, who was a Costa Rican national, died in 2000, after passage of the Helms-Burton Act; (e) through his will, Desiderio passed on his interest in La Marítima to his cousin, Dr. Garcia-Bengochea.

In sum, the district court went beyond the allegations in Dr. Garcia-Bengochea's complaint and attached exhibit in ruling on the Rule 12(c) motions. The court did so because the relevant facts were "agreed and undisputed." D.E. 120 at 3.[5]

Dr. Garcia-Bengochea generally objected to Carnival's Rule 12(c) motion on procedural grounds. He argued in his response that the motion was "procedurally improper" because it relied on matters extrinsic to the complaint and its attached exhibit. *See* CC D.E. 61 at 4 ("By improperly submitting evidence beyond the four corners of the [c]omplaint, Carnival hopes to force the conversion of this [m]otion into a motion for summary judgment under Rule 12(d), at a stage in the proceedings where [p]laintiff has not yet had access to any discovery."). He also cited to cases and authorities standing for the proposition that under Rule 12(c) a district court is

---

[5] On another issue raised by Carnival in its Rule 12(c) motion—whether Dr. Garcia-Bengochea validity inherited an interest in La Marítima from Desiderio under Costa Rican law—the district court declined to consider matters not alleged in the complaint or set out in its attached exhibit. *See* CC D.E. 120 at 5-6.

not required to accept matters outside the relevant pleadings.  *See id.* at 5.

Rule 12(d) addresses the submission and consideration of matters outside the pleadings in Rule 12(c) motions.  It provides that when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  *See* 5C Arthur R. Miller & A. Benjamin Spencer, Fed. Practice & Procedure § 1369 (3d ed. & April 2022 update) (explaining that a court has discretion to consider matters outside the pleadings under Rule 12(c) and convert the motion into one for summary judgment under Rule 56).

On appeal, Dr. Garcia-Bengochea does not raise any procedural challenges to the district court's Rule 12(c) rulings.  Indeed, consistent with his position below, he accepts the factual chronology set out above and asks that we rule on the merits that he can bring an action under Title III.  *See* Br. for Dr. Garcia-Bengochea in No. 20-12960 at 3–5.  Any procedural objections, then, have been abandoned and we will address the merits of the district court's rulings by using the undisputed factual timeline.  *See, e.g., PDVSA US Litigation Trust*, 991 F.3d at 1192–93 ("We normally decide cases and issues as framed by the parties, and here the Litigation Trust has abandoned any procedural objections to the champerty ruling by not raising them in its brief.  Like the district court, then, we address champerty on the merits.") (citations omitted).

## C

With certain exceptions not relevant here, Title III of the Helms-Burton Act provides that "any person" who "traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages[.]" § 6082(a)(1)(A). To result in liability, the trafficking must have taken place after November 1, 1996 (three months after the effective date of the Act, which was August 1, 1996). *See* § 6085(a).

At this stage of the proceedings, Dr. Garcia-Bengochea satisfies the requirements of these two provisions. Accepting the allegations of his complaint as true, (a) the Cuban government confiscated La Marítima after January 1, 1959; (b) the cruise lines trafficked in La Marítima after the effective date of the Act; (c) he is a U.S. national; and (d) he owns an interest (i.e., has a claim) in La Marítima. *See Havana Docks Corp. v. Carnival Corp.*, ___ F.Supp.3d ___, 2022 WL 831160, at * 42 (S.D. Fla. March 31, 2022) (setting out the elements of §§ 6082(a)(1)(A) & 6085(a)).

Two other provisions of Title III, however, contain limitations on which U.S. nationals can bring a claim:

> (B) In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.

(C) In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section.

§§ 6082(a)(4)(B) & (C).

The district court ruled that Dr. Garcia-Bengochea could not bring an action under Title III due to § 6082(a)(4)(B). As explained below, we agree. Because La Marítima was confiscated prior to 1996, and Dr. Garcia-Bengochea inherited his interest (i.e., acquired ownership of his claim) after Desiderio's death in 2000, he cannot assert a claim under Title III.

It is undisputed that La Marítima was confiscated prior to the Act's passage. The parties, therefore, understandably focus on the meaning of the word "acquires" in § 6082(a)(4)(B) and debate whether Dr. Garcia-Bengochea "acquire[d]" ownership of his claim before March 12, 1996.

Dr. Garcia-Bengochea contends that the word "acquires" does not encompass the passive act of inheritance and rather requires affirmative effort to gain ownership or possession. He asserts that this reading is the appropriate one given the text and purpose of the Act. If the district court's reading is sustained, he says, no heirs could bring Title III claims where the property was confiscated before March 12, 1996, but the original owner died after that date and bequeathed his interest.

The cruise lines, in support of the district court's rulings, construe the word "acquires" broadly to include inheritance. They argue that because confiscation took place before the passage of the Act, and because Dr. Garcia-Bengochea inherited ownership after 1996, he is barred from asserting a Title III claim by § 6082(a)(4)(B).

We begin where we must—with the text. When the words of a statute are clear, "we must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 486 (2015). Though the Helms-Burton Act defines a number of terms, *see* § 6023 (setting out the meaning of 15 words and phrases), it does not define the word "acquire[ ]." So we turn to ordinary meaning. *See Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1298 (11th Cir. 2018) ("[U]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.") (internal quotation marks and citation omitted).

In our view, the district court came to the correct conclusion. We agree with the Fifth Circuit's analysis in *American Airlines*:

> The plain meaning of "acquires" is "[t]o gain possession or control of; to get or obtain." *Acquire*, BLACK'S LAW DICTIONARY 29 (11th ed. 2019); WEBSTER'S THIRD NEW INT'L DICTIONARY 18 (1993) ("[T]o come into possession, control, or power of disposal of."). That includes inheritance. If Congress meant for "acquires" to require some form of active conduct, like a purchase, it knew how to communicate that meaning. In fact, it did so in the very same section of the

Act: "In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, *acquires ownership of a claim to the property by assignment for value*, may not bring an action on the claim under this section." 22 U.S.C. § 6082(a)(4)(C) (emphasis added). There would have been no reason for Congress to add the words "by assignment for value" if "acquires ownership" was already limited to assignment for value.

Every court to address the issue has read the statute the same way as we do. *See Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021) (holding that the plaintiff, who inherited property in 2016, "did not possess a claim to confiscated property until twenty years after the Helms-Burton Act's cutoff date"); *Glen*, 529 F.Supp.3d [at] 329–30, ("[S]ince Glen did not acquire the ownership of the claim before March 12, 1996, by inheritance or any other manner, he falls within the category of 'United States nationals' who 'may *not* bring an action under this section.'") (quoting 22 U.S.C. § 6082(a)(4)(B)); *Garcia-Bengochea v. Carnival Corp.*, 2020 WL 4590825, at *4 (S.D. Fla. July 9, 2020) (dismissing Helms-Burton Act claim where plaintiff inherited property after 1996); *Garcia-Bengochea v. Royal Caribbean Cruises, Ltd.*, 2020 WL 6081658, at *3 (S.D. Fla. Oct. 15, 2020) (same).

7 F.4th at 336.  *See also* Gonzalez, 835 F. App'x at 1012 ("The language that Congress used in this provision is clear and unambiguous. A U.S. national whose property was confiscated before March 12, 1996, cannot recover damages for another person's unlawful trafficking of that property unless 'such national'—i.e., the specific person bringing suit—acquired the claim to the property before March 12, 1996. And because the statute's text is plain, we have no power to waive or extend this deadline.").  We therefore affirm the district court's entry of judgment on the pleadings in favor of the cruise lines.

## IV

Dr. Garcia-Bengochea has Article III standing to assert his Title III claims against Carnival and Royal Caribbean under Title III of the Helms-Burton Act.  But those claims fail under § 6082(a)(4)(B) of the Act because the Cuban government confiscated La Marítima prior to March 12, 1996, and because Dr. Garcia-Bengochea acquired his interest in the property through inheritance after that date.

**AFFIRMED.**

JORDAN, Circuit Judge, Concurring.

José Martí, the 19th-century Cuban patriot, stateman, essay-ist, and poet, often used palm trees as metaphorical figures. In a speech to Cuban émigrés advocating for independence of his homeland from Spanish rule, he famously said that "las palmas son novias que esperan" ("the palm trees are brides who wait"). *See* José Martí, *Discurso en El Liceo Cubano*, Tampa, Nov. 25, 1891, in Martí en su Universo: Una Antología (Real Academia Española 2022). The phrase was a hopeful one for Cubans in the late 1800s and early 1900s, and it remains the same today for those who were forced to leave the island after Fidel Castro took power in 1959. Return, however, has only been a dream for Cuban immigrants. Today, more than 60 years have passed, and the palm trees con-tinue to wait.

Much was lost in the Cuban migration to the United States, and the Helms-Burton Act, 22 U.S.C. §§ 6021 *et seq.*, enacted by Congress in 1996, was an attempt to provide a means of financial compensation for some of that loss. For many Cubans who had property confiscated by the Cuban government, and who later be-came U.S. nationals, Title III of the Act was the only remedy avail-able to obtain monetary compensation.[1]

---

[1] As of 2018, 59% of the approximately 1.3 million Cuban-born immigrants in the United States were naturalized citizens. In numbers, that percentage amounts to about 767,000 persons. *See* Brittany Blizzard & Jeanne Batalova, *Cuban Immigrants in the United States*, Migration Policy Institute (June 11, 2020). *See also* Luis Noe-Bustamante, et al., *Facts on Hispanics of Cuban*

With respect to our decision today, I join Parts I and II of the court's opinion. As to Part III, I concur in the judgment but do so reluctantly because our interpretation of 22 U.S.C. § 6082(a)(4)(B)—which I think is unavoidable given the language of § 6082(a)(4)(C)—undermines the express purposes of Title III of the Act and leaves many (and maybe most) U.S. nationals without a remedy for the trafficking of their confiscated properties.

## I

As set out in the court's opinion, Dr. Javier Garcia-Bengochea alleged that he is a U.S. national and the rightful owner of an interest in La Marítima, which was confiscated by the Cuban government in 1960. A portion of that interest was certified by the Foreign Claims Settlement Commission in 1970 in resolving the claim of Albert Parreño, who was also a U.S. national. *See* CC D.E. 1-1 at ¶¶ 6, 7, 10 & Exh. A.

The parties agree that Albert, who died in 1972, passed on his interest in La Marítima to his brother, Desiderio Parreño, a Costa Rican national. And when Desiderio died in 2000, after the Helms-Burton Act went into effect, he passed on his interest in La Marítima to his cousin, Dr. Garcia-Bengochea. So Dr. Garcia-

---

*origin in the United States, 2017*, Pew Research Center (September 16, 2019) (noting similar percentage for 2017).

Bengochea obtained his interest in La Marítima through inheritance from Desiderio.

Two Title III provisions limit which U.S. nationals can bring a claim for the trafficking property confiscated by the Cuban government.  They read as follows:

> (B) In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.

> (C) In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section.

22 U.S.C. §§ 6082(a)(4)(B) & (C).  The dispute here centers on the meaning of the word "acquires" in § 6082(a)(4)(B).

## II

The majority, agreeing with the Fifth Circuit's resolution of the same issue in *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021), and with our unpublished decision in *Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021), affirms the district court's entry of judgment on the pleadings in favor of Carnival and Royal Caribbean.  I concur in that resolution, but think that the statutory interpretation analysis is more difficult.

The Helms-Burton Act defines a number of terms, *see* § 6023 (setting out the meaning of 15 words and phrases), but it does not define the word "acquires." Absent a statutory definition, we look to the "ordinary public meaning . . . at the time of enactment." *Bostock v. Clayton County*, 140 S.Ct. 1731, 1738 (2020).

The Fifth Circuit, and the district court here, reasoned that "acquires" in § 6082(a)(4)(B) is broad enough to encompass inheritance. *See Am. Airlines*, 7 F.4th at 336; CC D.E. 120 at 7. That aspect of the analysis, in my view, is too simplistic. "[B]road language is not limitless." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007). As a result, the ordinary meaning of a statutory term "is not always co-extensive with its broadest reach[.]" Brannon P. Denning, Bittker on Regulation of Interstate Commerce § 2.01 (Aspen Pub. 2d ed 2022). *See Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018) ("[A] statute's meaning does not 'turn solely' on the broadest imaginable 'definitions of its component words.' Linguistic and statutory context also matter.") (citation omitted); *Stenberg v. Carhart*, 530 U.S. 914, 1003-04 (2000) (Thomas, J., dissenting) ("We do not give statutes the broadest definition imaginable."). Our task is to ascertain "the more natural reading" under the circumstances. *See Jam v. Int'l Finance Corp.*, 139 S.Ct. 759, 769 (2019).

## A

Even if Justice Robert Jackson was correct in describing dictionaries as "the last resort of the baffled judge," *Jordan v. De-George*, 341 U.S. 223, 234 (1951) (Jackson, J., dissenting), our

current jurisprudence directs us to lay and legal dictionaries around the time of enactment to ascertain the meaning of statutory terms. *See, e.g., EEOC v. Catastrophe Management Solutions*, 852 F.3d 1018, 1026 (11th Cir. 2016).  The problem here is that the relevant dictionary definitions do not settle the matter.  The word "acquires" has both broad and narrow meanings, and dictionaries do not tell us what meaning to use for Title III.  So we have to rely on matters outside of the text to interpret the text.  As one scholar has so aptly put it, "[t]extualism demands nontextual sources of argument."  H. Jefferson Powell, A Community Built on Words: The Constitution in History and Politics 21 (2002).

Looking first to lay dictionaries published around the time the Helms-Burton Act became law, there are two different conceptions of the word "acquire."  One broadly encompasses possession by any means, while another more narrowly requires proactive, affirmative effort to gain possession.  *See* 1 New Shorter Oxford English Dictionary 20 (4th ed. 1993) (defining "acquire" broadly as to "[c]ome into possession of" and narrowly as to "[g]ain or get as one's own, by one's own exertions or qualities"); The American Heritage Dictionary of the English Language 12 (3d ed. 1993) (defining "acquire" broadly as "[t]o get possession of" and narrowly as "[t]o get by one's own efforts"); Random House Webster's Unabridged Dictionary 18 (2d ed. 1997) (defining "acquire" broadly as "to come into possession or ownership of" and narrowly as "to gain for oneself through one's actions or efforts").

More contemporary lay dictionaries follow a similar pattern of distinguishing between gaining possession by any means, including passive inheritance, and gaining possession through affirmative efforts. *See* 1 Shorter Oxford English Dictionary 20 (5th ed. 2002) (defining "acquire" broadly as to "come into possession of" and narrowly as to "gain or get as one's own; by one's own exertions or qualities"); The American Heritage Dictionary of the English Language 15 (4th ed. 2009) (defining "acquire" broadly as "to gain possession of" and narrowly as "to get by one's own efforts"); Webster's New World College Dictionary 12 (5th ed. 2018) (defining "acquire" broadly as "to come to have as one's own; get possession of" and narrowly as "to get or gain by one's own efforts or actions"). The same is true of current legal dictionaries. *See, e.g.,* Merriam Webster's Dictionary of Law 10 (2016) (defining "acquire" broadly as "to come into possession, ownership, or control of" and narrowly as to "obtain as one's own"); 1 Bouvier Law Dictionary Desk Edition 64 (2012) ("Acquisition may be direct or derivative.").

The district court opted to use Black's Law Dictionary, both the sixth edition—which was the most current edition prior to the enactment of the Helms-Burton Act—and the most recent eleventh edition. It concluded that the "plain meaning" of the term "acquire" was "broad enough to cover inheritance," but did not discuss the competing conceptions of the word "acquire" or why it chose the broader definition over the narrower one. *See* D.E. 120 at 7. Instead, the district court relied on the sixth edition's definition of the word "acquire," only citing the final entry, which

explained that the term "[i]ncludes taking by devise." *See* D.E. 120 at 7. But that very entry was followed by a case citation to *United States v. Merriam*, 263 U.S. 179, 184–85 (1923), which concerned the interpretation of a particular provision in a will and property "acquired *by bequest.*" Black's Law Dictionary 24 (6th ed. 1990). In that context, the definition of the word "acquired" invariably included inheritance because it was modified by the phrase "by bequest." That is not the case here with respect to § 6082(a)(4)(B).

In fact, the sixth edition of Black's Law Dictionary also defines "acquire" as "[t]o gain by any means, usually by one's own exertions." The entry therefore includes both broad and narrow understandings of the word "acquire." *See also* Burton's Legal Thesaurus 10 (4th ed. 2007) (categorizing "acquire" as a passive verb (i.e., "[r]eceive") and as an affirmative verb (i.e., "secure")); Black's Law Dictionary 29 (11th ed. 2019) (defining "acquire" generally as "[t]o gain possession or control of; to gain or obtain").

So a survey of lay and legal dictionaries reveals different possible interpretations of the word "acquire," and no definitive answer on which one should control here. "The bottom line is that the text [of § 6082(a)(4)(B)], taken alone, cannot provide a conclusive answer to our interpretive question. We must look further." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011).

## B

Clarity often comes with context. After all, to discern the meaning of a statute "words must be read and interpreted in their context, not in isolation." *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (internal quotation marks and citation omitted). *See also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context[.]").

And context includes textual purpose. *See Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1354–55 (11th Cir. August 23, 2022) (relying, in part, on congressionally-codified purpose of a federal law to confirm interpretation of a statutory term); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (Thomson/West 1st ed. 2012) ("Of course, words are given meaning by their context, and context includes the purpose of the text[.]"). Here Congress stated that Title III of the Helms-Burton Act is meant "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." § 6022(6) ("Purposes"). And it further explained that Title III's private right of action is a key tool in deterring trafficking in confiscated properties. *See* § 6081(11) (explaining that Title III's private right of action is designed, in part, to "deter" trafficking). *See also* § 6081(10) ("The

United States Government has an obligation to its citizens to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies.").

These codified purposes, it seems to me, call for a narrow interpretation of the word "acquires" that does not encompass interests in property obtained by inheritance. Such a reading benefits U.S. nationals whose property was confiscated by the Cuban government (furthering the compensatory purpose) and deters those who might later traffic in that property (furthering the deterrence purpose). *Cf.* Morell E. Mullins, Sr., *Coming to Terms with Strict and Liberal Construction*, 65 Albany L. Rev. 9, 75 (2000) ("An express statutory purpose of avoiding inadequate compensation for accident victims leads rather naturally to statutory construction in favor of such victims.").

Here's why. If the word "acquires" in § 6082(a)(4)(B) is read to encompass interests obtained by inheritance, then the provision operates contrary to Congress' express statutory purposes and is very hard to explain. The Cuban government carried out most of its confiscations of property held by U.S. nationals and U.S. companies in the early 1960s, shortly after Fidel Castro came to power. *See* Ada Ferrer, Cuba: An American History 347-48 (2021). The individual U.S. owners of confiscated property—assuming they were at least 20, the voting age in Cuba at the time, *see* Constitution of the Republic of Cuba, Title VII, Art. 99 (1940)—would be in their 80s today, assuming they were still alive. What compensatory and/or deterrent effect would Title III have if the only thing

potential traffickers had to do was wait until the original owners died to benefit from their confiscated properties?

Moreover, as noted in the court's opinion, Congress built in a six-month suspension provision for Title III, *see* § 6085(c)(1)(B), and from 1996 to 2019 every U.S. President suspended the right to bring an action under Title III. That rendered Title III dormant for over 20 years and left the U.S. owners of confiscated properties without a remedy for that period with respect to trafficking in their properties. If those owners died during the long suspension of Title III, and the word "acquires" is read to encompass inheritance, their U.S. national heirs could not sue for trafficking. The only heirs who could bring actions under Title III would be those U.S. nationals who—by happenstance—inherited their interests in confiscated properties before March 12, 1996.

That does not make much (if any) sense. I can think of no rational basis for allowing heirs to sue if they inherited their interests in confiscated properties prior to the passage of the Helms-Burton Act, while at the same time precluding heirs who inherited their interests after enactment. Imagine twin Cuban brothers who co-owned a casino that was confiscated by the Cuban government in 1960. Both brothers fled to the United States and became naturalized U.S. citizens in the 1970s. In December of 1995, before the Helms-Burton Act became law, one brother died and, in his will, left all of his property and interests to his only daughter, who was born in the United States and is a U.S. national. The other brother died in April of 1996. In his will he left all of his property and

interests to his only son, who was also born in the United States and is a U.S. national. If the word "acquires" in § 6082(a)(4)(B) encompasses inheritance, then the daughter of the first brother could sue under Title III (because she acquired the claim before March 12, 1996) but the son of the second brother could not (because he acquired the claim after March 12, 1996). Given that death is not usually planned around legislation, there does not seem to be a logical basis for such an outcome given the express purposes of Title III. *See* Br. for Dan Burton, Robert Torricelli, and Directorio Democratico Cubano, Inc. as *Amici Curiae* in No. 20-12960 at 26 ("If the vast majority of eligible claims were excluded because they were inherited after March 12, 1996, the compensatory and deterrent purpose of the law would be substantially gutted."). The cruise lines, and the United States as *amicus curiae*, offer no satisfactory explanation as to why Congress would decree this state of affairs. *See, e.g.,* Br. for Carnival in No. 20-12960 at 29-39; Br. for United States as *Amicus Curiae* in No. 20-12960 at 23-28.

Indeed, the legislative history indicates that Congress was worried not about the inheritance of interests in confiscated properties, but about the sale, trading, or bartering of such interests after the passage of the Helms-Burton Act. Congress was concerned that Title III would, upon enactment, create a marketplace for interests in confiscated properties and to claims for trafficking in those properties. The House Conference Report, for example, stated that §§ 6082(a)(4)(B)-(C) were "intended, in part, to eliminate any incentive that might otherwise exist to transfer claims to

confiscated property to U.S. nationals in order to take advantage of the remedy created by this section." H.R. Conf. Rep. 104-468 at 59 (March 1, 1996).[2]

Title III provided a new way—through a private right of action for claims of trafficking—to monetize interests in confiscated properties. It therefore created value for claims that had seemed practically worthless given the inability of the United States to reach any financial settlements with the Cuban government. A U.S. national who had no relationship to confiscated property, having taken note of Title III's remedies, might find it lucrative to buy a claim that could pay dividends every time the confiscated property was "trafficked." *See* W. Fletcher Fairey, *The Helms-Burton Act: The Effect of International Law on Domestic Implementation*, 46 American U. L. Rev. 1289, 1308 n. 108 (1997). Congress wanted to prevent that sort of a marketplace for Title III claims—a concern not present when one U.S. national, through a will, passes on his or her interest in confiscated property to a relative who is also a U.S. national.

If the only statutory language at issue was the text of §6082(a)(4)(B), I would read the word "acquires" as not encompassing inheritance. That interpretation would best reflect Congress' expressly-stated purposes for Title III—compensation and

---

[2]"Legislative history is not the law, but it can help us understand what the law means." Robert J. Katzmann, Judging Statutes 38 (2014). That, I submit, is the case here.

deterrence. *See Central Hanover Bank B. & T. Co. v. Commissioner*, 159 F.2d 167, 169 (2d Cir. 1947) (L. Hand, J.) ("There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will, or a contract—than to read it literally, forgetting the object which the document as a whole is meant to secure."); Stanley Fish, The Trouble with Principle 5 (1999) (explaining that, when a statute is "detached from the history that renders it intelligible," it "becomes unreadable, or . . . readable in any direction you like").

## C

Given what I have said in Part II.B, one might wonder why this is a concurrence and not a dissent. That is a fair question, and one I will try to answer.

Legislation is not always pristine. And sometimes Congress, despite a very clear intent, drafts poorly. That is what I think happened here. At the end of the day, there is one reason why I ultimately conclude that § 6082(a)(4)(B) must be interpreted as written despite its incongruity with express legislative purpose. The reason is that § 6082(a)(4)(B) cannot be read in isolation and must be interpreted with reference to its statutory companion, § 6082(a)(4)(C).

Generally, an identical term used in the same statute is presumed to have the same meaning throughout. *See, e.g., Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980). Though that presumption can be rebutted, *see Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (explaining that "[a] given term in

the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies"), I do not believe it can be successfully overcome here.

In defining the scope of liability for trafficking, Title III provides that "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to *any* United States national who *owns the claim* to such property." § 6082(a)(1)(A). Nothing in the language of Title III indicates that Congress intended to limit the remedy to the original owners of the property or the even the original claimants. It only requires that the individual be a U.S. national and "own[ ] the claim." *See also* 22 U.S.C. § 1643(*l*). To own a claim, of course, a person must have obtained it or received it in some way.

As a reminder, § 6082(a)(4)(C) provides that "[i]n the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section." Congress used the word "acquires" in this provision in its active sense (to obtain by assignment for value), and by doing so indicated that the word generally encompasses both passive and active means of acquisition.

There are two textual differences between §§ 6082(a)(4)(B) and 6082(a)(4)(C). The first difference is that § 6082(a)(4)(B) governs claimants whose property was confiscated *prior* to March 12, 1996, whereas § 6082(a)(4)(C) governs claimants whose property was confiscated *on or after* that date. The second difference is that

the word "acquires" in § 6082(a)(4)(C) is modified (and limited) by the phrase "by assignment for value."

This is where Dr. Garcia-Bengochea's suggested interpretation of the word "acquires" in § 6082(a)(4)(B)—i.e., that it requires affirmative effort—runs into trouble. A claimant whose property was confiscated on or after March 12, 1996, and who obtains ownership of a claim through inheritance, is not barred by § 6082(a)(4)(C) and can bring an action for trafficking under Title III. If "acquires" in § 6082(a)(4)(B) is limited to gaining possession via affirmative effort (i.e., not inheritance), why would there be a need for Congress to modify "acquires" in § 6082(a)(4)(C) with respect to the purchase of claims on or after the passage of the Helms-Burton Act? The modification (and limitation) of "acquires" in § 6082(a)(4)(C) strongly suggests that the word—unless modified—generally includes both passive and active acquisitions of interests in confiscated properties, and that if Congress wanted to limit the word it knew how to do so. This was a point made by the Fifth Circuit in *American Airlines* and by the district court here, and in my view it is the critical one. *See Am. Airlines*, 7 F.4th at 336 ("If Congress meant for 'acquires' to require some form of active conduct, like a purchase, it knew how to communicate that meaning. In fact, it did so in the very same section of the Act. . . . There would have been no reason for Congress to add the words 'by assignment for value' if 'acquires ownership' was already limited to assignment for value.").

I concede that this is not a wholly satisfactory resolution in light of Congress' express twin purposes of compensation and deterrence.  U.S. nationals who are heirs of individuals whose property was confiscated after passage of the Helms-Burton Act can bring Title III claims, but many U.S. nationals who are heirs of individuals whose property was confiscated in the 1960s—as the vast majority of property was—are denied a Title III remedy.  Why would Congress deny a Title III claim to heirs of those more likely to be more numerous and older but allow a claim to heirs of those who suffered later (i.e., post-enactment) confiscations?  I do not have any ready answers.  All I can say is that, in my view, Dr. Garcia-Bengochea's interpretation of § 6082(a)(4)(B) is inconsistent with the language of § 6082(a)(4)(C).  The combined language of §§ 6082(a)(4)(B) and 6082(a)(4)(C) cannot bear the weight of Dr. Garcia-Bengochea's reading.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005) (explaining that an "odd" drafting error is "not absurd" and when such a drafting oddity occurs, "it is up to Congress rather than the courts to fix it").  *See also* 1 Joseph Story, Commentaries on the Constitution of the United States § 427, at 303 (1833) explaining that to disregard the text of a provision "the absurdity and injustice of applying the provision to the case [must] be so monstrous, that all mankind would, without hesitation, unite in rejecting the application").

Interpreting § 6082(a)(4)(B) as the Fifth Circuit did (and as we do today) goes against the express purposes of Title III, but it is not absurd.  While the reach of Title III is narrowed—and maybe

significantly so—there is still a group of people whose heirs will be able to file suit under the Act—namely, the U.S. national heirs of owners who passed away and bequeathed their property interest prior to the passage of the Helms-Burton Act.

Earlier, I used the example of Cuban twin brothers who co-owned a casino that was confiscated by the Cuban government to show how our interpretation of § 6082(a)(4)(B) does not make much sense. In that hypothetical, one twin's heir could sue under Title III and the other twin's heir could not, solely because of when the heirs acquired the claims. This is illogical but it is not absurd—one heir could still sue under Title III. Although I cannot identify the exact number of U.S. national heirs in this position, I think I can at least say that Title III remains partially effective.[3]

### III

I join Parts I and II of the court's opinion and concur in the judgment as to Part III. If, as I suspect, the language of

---

[3] The Foreign Claims Settlement Commission adjudicated 8,821 claims by U.S. nationals against Cuba and found 5,911 to be compensable. *See* U.S. Dep't of Justice, Completed Programs – Cuba (updated April 21, 2022) (available at https://www.justice.gov/fcsc/claims-against-cuba). The overwhelming majority of these claims (5,909) were filed and adjudicated by July of 1972—well before the passage of the Helms-Burton Act. *See id.* It stands to reason that of those claims, some number—albeit unidentifiable—were made by people who acquired their interest—as we interpret § 6082(a)(4)(B)—prior to the passage of the Helms-Burton Act. That of course, says nothing about what happened to those claims after the original claimants died.

18                    JORDAN, J., Concurring                    20-12960

§6082(a)(4)(B) was the result of sloppy drafting, I urge Congress to fix it.